All right, Madam Clerk, would you please call the case? 320384, the people of the state of Illinois, acquitted by Nicholas Atwood v. Jamal Younger, appelled by Adrian Sloan. All right, Mrs. Sloan, are you ready to begin?  May it please the Court, my name is Adrian Sloan, I'm here with the Office of the State Appellate Defender, and I represent Jamal Younger. I'm going to focus today on Issues 2, 4, and 5 in my brief, but of course I'm happy to answer questions on any of the issues. Jamal Younger's was a case about intent. The sole issue for the jury to determine was whether Jamal acted with the intent to promote or facilitate the actions of Leland Howard. The state didn't seek to prove that Jamal was accountable for the killing of Jordan Allison, however, it sought to demonstrate that Jamal was a bad person, deserving of punishment. The state convinced the jurors that Jamal had the requisite criminal intent by presenting inflammatory, inadmissible evidence about themes other than the offense at hand. The result was an unfair trial. First of all, the trial court erred when it allowed the state to present evidence of the taft shooting. The taft shooting occurred just hours after the instant offense, but it was in no way relevant to Jamal's guilt for the offense at bar, chiefly because the state didn't provide any evidence to prove that Jamal was actually involved in the taft shooting. The only testifying eyewitness to this offense, Jason Davis, stated that Jamal was not in the car during the taft shooting. The state didn't even prove that the other people involved in the instant shooting, Leland Howard or Jordan Logan, were involved in the taft shooting. In fact, when shown a lineup, including Jordan Logan, Jason Davis could not identify him as being part of the taft shooting. It's well established that other crimes' evidence is inadmissible just to prove a defendant's propensity to commit a crime. The taft shooting was let in under the lack of mistake exception to this rule, but that exception is completely inapplicable because the offense occurred after the offense in question, meaning there is no way for it to have provided the jurors with any insight as to Jamal's mindset at the time the instant offense was committed. The defense implicitly concedes on appeal that lack of mistake was an inappropriate exception to justify the omission of the taft shooting, but the state argues that the offense was relevant to Younger's MO. But under People v. Thingvold, other crimes' evidence is only admissible under any of the exceptions if the state can prove that the defendant can establish that the defendant participated in the offense. The state, again, did not do so here. Even assuming, however, that the offense should be analyzed for admissibility under MO, the two offenses were not similar enough to warrant admission under this exception. The instant case occurred in the middle of the night and involved two vehicles, and the taft shooting occurred between a car and a pedestrian and was motivated by a verbal altercation. The instant offense occurred on a public street, whereas the taft shooting occurred, of course, in the taft homes. The state argues that less similarities are needed when MO evidence is being used to prove criminal intent in the offense charged, but the fact remains there still must be some similarity, and here there is hardly any. On the other hand, the prejudicial effect here was extraordinary. The state used the taft shooting to tell the jurors that Jamal is prone to crime generally. It's propensity evidence. It's the precise type repeatedly held inadmissible because it has a dangerous ability to over-persuade jurors. Moving on to the next argument, the prejudicial effect of the taft shooting was only compounded by the admission of other highly prejudicial, hardly relevant evidence, again, used simply to paint Jamal as a bad person. The state presented a cell phone search from after the offense where Jamal Googled .40 caliber bullets, a Facebook message where he wrote XD40 for sale, and a post on Facebook where Jamal shared an article about Allison's death. The state used all of these pieces of evidence to prey on the emotions of the jurors, to tell them the extremely inflammatory story that after this offense, Jamal bought .40 caliber bullets, tried to sell the murder weapon, and bragged about Allison's death. But the truth of the matter is, the state didn't prove that any of this happened. The state's evidence only demonstrated that Jamal looked at his phone for .40 caliber ammunition. It didn't prove he bought any, and it didn't even prove that .40 caliber ammunition was used in the taft shooting. The state's evidence only demonstrated that Jamal wrote out the Facebook message XD40 for sale. It didn't prove he sold a gun, or that the gun he referenced was the murder weapon, or that he was ever in possession of the murder weapon. This evidence was dangerous. It had the ability to convince the jurors that Younger was guilty because he took several incriminating post-crime actions. But where the state's evidence in no way proved that he actually took these actions, the probative value of this evidence was far too low for it to be admitted. And as for the Facebook post wherein Jamal shared Allison's death, the state concedes on appeal that this evidence lacks relevance. It doesn't relate to a fact in a dispute. It has no probative value. It only has the prejudicial effect of telling the jurors that Jamal is an evil person who brands a gun a murder. Jamal was supposed to be on trial for the offense FR, not for things he supposedly did following it. The state's only purpose in admitting this cell phone evidence is to tell the jurors that Jamal is a bad person and to ask them to convict him based on the unflattering picture they painted rather than whether he committed this crime. Moving on to the next argument, defense counsel trying to remedy the mini-trial that Jamal faced regarding the Taft shooting and redirect the jurors to consider Jamal's intent in the Allison shooting asked the judge to provide IPI 5.01 which defines intent. The definition of intent was crucial here where the jury was told to convict Jamal only if they found that he had the intent to promote or facilitate the commission of this offense. The trial court refused to give this instruction. Refused to tell the jurors that the intent to promote or facilitate Leland Howard means the conscious objective or purpose to do so. Moreover, the judge made this ruling because he had the incorrect understanding of the role that intent played in Jamal's conviction. People v. Avgib, a case which came down just about two weeks ago, is instructive on this issue. There, the appellate court found that a trial court erred in failing to provide the intent IPI in an accountability case because the trial court found that the instruction was confusing or inaccurate even though it was accurate and would correctly convey accountability law to the jurors. That's exactly what happened here. The judge stated that the instruction didn't apply to the facts of this case or first degree murder as charged by accountability but the judge was incorrect so this court should apply Avgib and find that this was a similar error. Again, this error only compounds on the previous ones. IPI 5.01 was the defense's chance to refocus the jurors to explain to them that at issue was whether Jamal had the conscious objective or purpose to help Howard shoot into the car in the instant case. The jurors shouldn't have convicted Jamal because they thought he bought bullets and committed the taft shooting so he was a repeat criminal. They shouldn't have convicted Jamal because they thought his Facebook post meant that he was evil. They shouldn't have convicted him because they thought, as the state repeatedly told them, that Jamal was prone to crime. The jurors should only have convicted Jamal if they found he had the intent to facilitate Howard's actions in the crime FR. IPI 5.01A was integral to giving the jurors that information and without it, Younger faced trial by a jury who was told that Younger probably committed this crime because of multiple pieces of inflammatory, irrelevant evidence supposedly about his character. Finally, in keeping with the theme of this trial, Jamal's character was attacked yet again at sentencing where the judge ignored most relevant mitigating factors and imposed an extraordinarily high sentence based mainly upon how Jamal acted during this trial. The trial court disparaged Jamal, calling him a petulant, childish soul, mocking his childhood as a, quote, pitiful existence and remarking, if anyone wonders how you raise a child that's important, they should look at you. The trial court also mocked Jamal's allocution, calling it a weak little bunch of words. He said all of this, made all of these comments about who Jamal was as a person, ignored all mitigating factors, and then sentenced him to a term of 66 years, meaning Jamal will almost certainly die in prison. This was an abuse of Judge Lyons' discretion. In sum, we would ask that Jamal Younger receive a new, fair trial where he can be judged by the state's evidence against him in the instant case or that his sentence be reviewed or reduced. If there are no other questions. Do you have any questions, Justice Devaney? I do not. Questions, just to help? No. Okay, thank you.  Judge Atwood, are you ready to proceed? Good morning, Your Honor. Good morning. Good morning, counsel. May it please the court. My name is Nicholas Atwood, and I represent the people of the state of Illinois in this matter. I will try to address the issues the defendant raised in the order of her argument. With regard to the first issue, the defendant argues that the other crimes evidence was admitted under an abuse of discretion by the trial court. The people submit that this wasn't an abuse of discretion. And the first thing that I would point out about the defendant's argument is that it wasn't simply admitted for lack of mistake. The people proffered that evidence as other crimes evidence for lack of mistake and or modus operandi. And as this court knows, you can affirm the trial court's order regardless of the reasoning that it gives, as long as the record supports that reasoning. And the record in this case clearly establishes that the modus operandi exception does apply in this case. The first thing the defendant argues is that the tap shooting was not relevant because it occurred after the Allison shooting. However, as this court is well aware, it's of no consequence whether the offense occurs before or after the incident for which the defendant is on trial. This court held that in People v. Collins, 51-03-993. So the fact that the shooting occurred approximately 24 hours later is of no relevance to the determination of whether the facts of the tap shooting can be admitted under the modus operandi exception. In addition, in People v. McKibbins, the Illinois Supreme Court stated that we need mere general similarities to establish an intent exception under modus operandi. And here we have much more than general similarities. We have three different shootings that occurred over the course of a month. We know for a fact that .40 caliber ammunition was used in the New York Avenue shooting, which is in the neighborhood of the tap homes. We know that .40 caliber ammunition was used in the murder of Jason Allison, which occurred in the vicinity of the tap homes nearby in Peoria. And finally, we know that on the day of the tap shooting, the defendant was using his phone to search for purchasing additional .40 caliber ammunition. Now, what's interesting about this fact is that when Detective Mosterlin was interviewing the defendant, the defendant said that on the day of the tap shooting, he'd gone to the tap homes, left, went to Walmart, and then came back to the tap homes after that. On the defendant's phone, the very last search he made was .40 caliber ammo, Walmart. So clearly, he was going for the lowest price .40 caliber ammunition. He found that because there were other searches, perhaps for Bass Pro Shops or another store. And upon finding the lowest price, he went there to purchase additional .40 caliber ammunition, which can be inferred that they needed that ammunition to conduct the shooting that occurred shortly thereafter. It would be reasonable for the jury to have concluded this because .40 caliber ammunition had been used in the prior shootings. It's logical that they needed more .40 caliber ammunition for the .40 caliber handgun that the defendant offered for sale on Facebook less than 24 hours after the shooting, after he found out that he was under investigation. The very same reason that he called his girlfriend Josie and asked her to report her white Grand Am is stolen. The same white Grand Am that was used in the Jordan Allison shooting, and it was also used in the tap shooting. And defendant states that Jason Davis testified that the defendant wasn't the driver. But what Jason Davis had actually said that he didn't believe so when asked to identify the defendant, but he had told the officers on that day he didn't get a good look at the driver. He couldn't identify really anyone because they were driving away. But what he did describe was a light-skinned African American with a bushy beard and unkempt dreadlocks, which is the very same description that the defendant's girlfriend gave him in which a picture in evidence shows. So clearly we may not have a 100% proof positive identification, but the case law doesn't require that as long as there is some other fact to aid the trial court in making that determination. And so we can look at the fact that the defendant was present at the tap homes, we know he was driving the vehicle earlier that same day. We can infer from that that, okay, we didn't get a perfect description, but we've got a pretty good description here. So based on those facts, these three different drive-by shootings or really chases that occurred over the course of this one month, this is far more than mere general similarities. This is practically identical crimes being committed. The defendant and this group of people are driving around Peoria menacing individuals, firing out of their car. The defendant is driving while his passengers are hanging out the windows, shooting at other vehicles. It's the same crimes, just different victims in maybe slightly different areas. I think this is clear that it satisfies the McKibbin low bar there. One other thing that I would mention too, the defendant admitted to the investigating officer that Breland Davis's car was blue in color. So how would he have known that fact if he had not been present during that tap shooting? The only person that said the defendant wasn't there was the defendant himself, and the record indicated he lied more than 100 times in his interview with authorities and lied until he was completely trapped. That is, the officers were able to confront him with information that said, no, what you're telling me is inaccurate, you were present, and then his story changed. So the jury can look at that information and the judge can look at that information, and we can clearly see that the defendant is involved here. Turning to the next argument, the defendant argued that his trial counsel was ineffective for not moving to suppress the Facebook post for the XP-40 handgun for sale, the cell phone data that showed that he was searching for .40 caliber ammunition on the day of the shooting, and for the article related to Jordan Allison's death. So what to object to is a matter of trial strategy. And a trial counsel is not going to be found ineffective for making meritless objections, and these would have been meritless objections because this evidence was relevant and admissible. With regard to the XP-40, as we've established, these shootings all involve a .40 caliber handgun. Within 24 hours of finding out he's under investigation for this tap shooting, the defendant tries to get rid of a .40 caliber handgun less than a day after he's purchased .40 caliber ammunition. These dots are easy to connect. That's a relevant piece of information that the defendant himself is posting on his Facebook page, an ad to get rid of this handgun. It also shows a consciousness of guilt. The case law is very clear. When you try to get rid of evidence or hide evidence, that establishes a consciousness of guilt. So it's relevant for that fact. The ammunition, that's relevant for some of the reasons I've already stated. We know that .40 caliber ammunition was used in at least two of these shootings. A .40 caliber handgun is being advertised by the defendant. This is going to be relevant and let the jury determine how much weight to be given to that. So again, counsel not objecting to that, it's not going to make any difference because that evidence was already admissible. With regard to the article of Jordan Allison, as the defense counsel stated, the people do agree the relevance here was tenuous. But you have to also look at, okay, maybe it wasn't that probative, but was he prejudiced by it? It was simply an article posted to his Facebook page with no other context. The state at trial tried to argue that this was a brag, but I don't think anybody would think that's really a reasonable inference. The defendant himself testified that he knew Jordan Allison and that he never had any ill will or any intent to harm him. And so it could be interpreted as much as a condolence as a brag or a threat. And I think when you compare that with all the other evidence that we do have about the defendant's involvement, it really carried no weight for the jury, and the defendant couldn't meet his burden of showing that he was prejudiced to the extent that had counsel objected to this, it would have altered the course of his trial. And so I think on that basis, counsel was not in effect. Turning to the issue of the 5.01a instruction, I think this is perhaps one of the more interesting issues in this case. The comments are clear in 5.01a. The committee comments stated, if given, it should only be given when the result or conduct at issue is the result or conduct described in the statute defining the offense. Defining the offense is the key phrase there. The offense is not the definition of accountability, which was what defendants sought to define what intent meant in the context of the accountability definition. The offense is murder. And so what this instruction is saying is that this instruction should only be given when you are proving a specific intent, not to define other words like intent or knowingly that may occur in different contexts, perhaps in affirmative defense, perhaps in the accountability instruction. And what is interesting about this, the case law says intent and knowingly have plain meanings. So the court can use this discretion and determine, well, those have plain meanings. We don't even need to give this instruction. If the jury is not requesting further instruction, which they didn't here. But counsel cites People v. Abnick, which was a recent first district case, which did apply 5.01a in the same context as here under an accountability theory to define intent. I think that Abnick is wrongly decided. And I think it's wrongly decided because if you look at the committee notes when they created this instruction, 5.01a, they cited People v. Brodeur, which is a case that relied principally on People v. Montgomery. Brodeur is 168, Illap, 3rd, 938. Montgomery is 18, Illap, 3rd, 828. Montgomery, like this case, involved a defendant who was charged under accountability but had also asserted a voluntary intoxication defense, which was still a usable defense, I think, in the 1970s when Montgomery was decided. He said that the court should instruct on the definition of intent for accountability and knowing for voluntary intoxication because there was a knowing element required in that affirmative defense. And the court said, no, we're not going to do that. And they talked about the fact that these words have plain meaning, we're not going to do it. It was in the wake of those cases that the committee decided to draft 5.01a and specify the language in it. Advocate never discusses any of those cases. And I think it's clear, based on the plain language of that instruction, the statute defining the offense is not referring to the definition of accountability. That is not an offense. That is just an aid for the jury to interpret what accountability means when an individual is charged under that theory. Counsel, wasn't Advocate based on the fact that the jury was confused, the jury's questions indicated that they were confused? That is exactly right, Your Honor. And that is more of an opportunity for error if a counsel doesn't request it in that context or for when counsel does, which I think was the case in Advocate, the judge does abuse his discretion when that happened. But that happens in all cases that are similar to that. When the jury does express confusion, the trial court is obligated to clarify that with an instruction. That comports with the whole purpose of 5.01a. But I think the main difference is Advocate is simply wrong. No other case holds that you should apply 5.01a to the intent element of an accountability theory. Because I think it goes with, and I think the trial court understood that. The trial court in this case gave a number of different examples talking about why he didn't think that it would make sense to apply that. And he even used some sort of an analogy with a train and an engineer who knows a train is about to commit a crime versus an engineer that doesn't know they're about to injure some people. He's expressing what the difference is here between defining intent in a specific offense versus potentially injecting error and confusing the jury as to intent just as a word within the accountability instruction. And so I think if you look at those cases, Brodeur, Montgomery, you think about the language of 5.01a, I think we can easily conclude here that the defendant failed to meet his burden in showing that this was an abuse of discretion. I think Advocate has wrongly decided not aware. I think that case has been out so recently I'm not even sure the PLA has been filed in that. So depending on what happens with that, it might be prudent for this court to hold this opinion in advance until the Supreme Court grants a PLA and sorts the issue out. One other thing I wanted to remark on, I don't think counsel talked too much about the issue regarding the trial court's denial of his request to represent himself, which occurred on the fourth day of trial. This error wasn't properly preserved, so the defendant not only has to show this abuse of discretion, they've got to show clear error in this circumstance. And people be burdened, the Illinois Supreme Court case stated that if a request is untimely, it falls squarely within the trial court's discretion. And here we're on the fourth day of a murder trial with a jury, and the defendant made numerous arguments related to the trial court's questioning of the defendant and saying that, oh, well, that's not a good enough reason for me to do that. I don't believe the trial court is trying to say, you know, I'm going to just categorically deny this. The trial court was aware it was untimely. It said, I wouldn't allow that from the state or anyone else on the basis we're in the middle of a trial when the defendant requested to represent himself. I think what the trial court was trying to do was exercise this discretion and say, look, is there some sort of a critical breakdown between you and your attorney that would have a negative effect on this trial that would not allow you to proceed? And when the defendant just voluntarily wanted to ask some different questions, I think the trial court exercised his discretion and said, well, that's not really a good enough reason to go against all this precedent to disrupt this trial that's already been disrupted once by COVID by now having you represent yourself. And then, of course, as this court noted in People v. Sanchez, the defendant had not necessarily showed the court that it would responsibly handle this duty of representing himself where he called a testifying officer a clown on the second day of trial. He accused an officer of lying. And as the court stated in its sentencing, he was childish and petulant throughout the proceedings. I think he flipped the bird to some people. Clearly, the court was exercising discretion out of a fear that this individual may further disrupt things, may try to go for a mistrial as he did later on when he tried to show the jury his jail bracelet, etc. And with that, I see that I'm almost out of time. So you agree the judge did not follow Supreme Court 401 in his questioning of the defendant, but you're saying he didn't need to because the motion itself to go pro se was untimely. That's correct. Burton, I think, clearly carves out an exception in that situation. When you're on the fourth day of a trial, we didn't find any case law that was anything similar to a fourth day of trial request. Most of them were not of use of discretion on the first day of a trial or just before a trial. And I see that I'm out of time. Do your honors have any further questions? Can you address the sentencing issue? With regard to the sentencing, I think the facts of the case supported the sentence that was received. I think the trial court, while he did admonish the defendant on several of his behaviors and antics, I think the record was clear that there were real bases based on his criminal history and his involvement in essentially a spree of shootings that occurred, that this person was a menace and a danger to the public, and that real harm was committed against the victims in this case, even if the defendant himself wasn't the shooter. And I also think the defendant made an argument about his young age, but recently the law has been changing on that. Our Supreme Court in People v. Wilson adopted the U.S. Supreme Court's ruling in Jones v. Mississippi, and so the defendant's age of 22 was not a mitigating factor, which the defendant spent some time in his brief arguing that his age should have been a mitigating factor. But the case law now is very clear that it is not. And with that, I will stand on my brief for the remaining issues. Any other questions? None. Thank you. Thank you. Ms. Sloan, you've got the last slide. Just a couple of points, Your Honors. First of all, regarding IPI 5.01a, I did want to point out that in AFTIC, there was not a jury question on the definition of intent. Even so, the appellate court found that the trial court erred by failing to give this instruction. And the reason for that was, as in this case, the trial court was incorrect that the instruction would not correctly state the law. AFTIC was an accountability case, just as this case was. And just like in this case, the judge said, I think this instruction is legally inaccurate or inapplicable, but that wasn't the case. And so the court found that that was an error, and it was a reversible error. Was AFTIC a general intent murder case, or was it an attempt murder case? It was an attempt. But that has a specific intent, correct? Yes, but it was still an attempt murder case via accountability. So the jury was given the accountability instruction in AFTIC. The accountability instruction includes the word intent. So it's reasonable to assume that the jurors need to be instructed on intent, that to be guilty of both first-degree murder and attempt murder based on accountability, the defendant does need to have the intent to promote or facilitate the action, which means the conscious objective or purpose to do so. As for the self-representation issue, I would note that that is structural error, so there's no prejudice analysis. I will also note that, yes, the judge never said that the reason that Jamal could not represent himself was because of his conduct. He barely said the reason he couldn't represent himself was because it was in the middle of trial. What he did do was he said, yes, it's in the middle of trial, but why don't you articulate to me some reason why you would be able to do a better job at defense counsel? Cases have repeatedly held that that's not a reason. A judge can't deny a defendant his right to self-representation because he doesn't think it's a good idea. He doesn't think that he's going to do as good a job as an attorney. I'll talk now briefly about the tax shooting, if that's okay. Ethan, you don't begin analyzing admissibility of evidence under the modus operandi exception until the state can establish that the defendant participated in the offense. Again, the state put on Jason Davis. Jason Davis was asked on cross-examination, looking at Jamal Younger, was this person part of the tax shooting? Was this person in the car? And he did say, I don't believe so. Yes, he generally describes someone who had light-skinned dreadlocks that is similar to how Jamal looks, but he looked at Jamal and he said, I don't think this was him. There's no ballistics tie. I don't think it was him or I don't believe it was him. I don't believe it was him, sorry. There's no ballistics tie between this offense and the tax shooting. And again, the other people that were part of the incident shooting were not identified as part of the tax shooting either. Again, regarding the ammunition, the state's evidence established that he looked on his phone for it. They did not establish that he bought it. And the state's only evidence that Jamal went to Walmart came with Jamal's own testimony. And Jamal testified that he went to Walmart while the tax shooting was taking place. So if we're going to accept Jamal's testimony that he was at Walmart, we should accept Jamal's testimony as to when he was at Walmart. As for the fact that Jamal knew that the car involved in the tax shooting was blue, there are any number of reasons he could have known that besides having participated in the offense. His girlfriend's car was used in this offense. You know, it took place in a tax shooting, which was an area he frequented. Also, the state provided a jail cell phone call where Jamal Younger stated, they tell me it was blue. And he was ostensibly referring to the officers as they. So even though Officer Moslin said he didn't tell him it was blue, we don't know every piece of investigation, every time Jamal was talking to the officers aside from Moslin. If there are no other questions. Questions? No.  No, thank you. All right, thank you. Thank you. All right, thank you both for your arguments. This morning we'll take this matter under advisement and issue a decision in due course.